UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 9/28/2015

JOHN MICHAEL TWOMEY a/k/a SEAN
TWOMEY,

               Plaintiff,

        v.

QUAD/GRAPHICS, INC.,

               Defendant.

No. 13-CV-1109 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

      This case arises from Plaintiff John Michael Twomey's termination by his former employer, Defendant Quad/Graphics Inc. ("Quad"). Plaintiff asserts claims for age-based employment discrimination and breach of contract. Before the Court are Defendant's motion for summary judgment on all claims, and Plaintiff's motion for partial summary judgment on the breach of contract claim. For the reasons set forth below, Defendant's motion is granted in its entirety and Plaintiff's motion is denied.

## BACKGROUND[1]

      Plaintiff John ("Sean") Twomey is a former employee of Quad, a commercial printer operating in the United States, Europe, South America, and Asia. Def. 56.1 Statement ¶¶ 1, 4. The central dispute in this case is the basis for Plaintiff's termination by Quad on November 9, 2012, and its subsequent fallout. Quad claims that the termination was the result of a "discrete

---

[1] The facts set forth herein are taken from the parties' Local Civil Rule 56.1 Statements relating to Defendant's Motion for Summary Judgment. The Court does not cite separately to the statements relating to Plaintiff's Motion for Partial Summary Judgment, which contain almost entirely duplicative facts. When only one party's Rule 56.1 Statement is cited herein, the opposing party does not dispute that fact or has offered no admissible evidence to controvert it.

restructuring" of a business unit at the company that resulted in the terminations of four other employees. *Id.* ¶ 1. Plaintiff claims, however, that he and other employees were terminated on the basis of their age. *Id.* ¶ 2; Pl. Resp. 56.1 ¶ 2.[2] Plaintiff further contends that after his termination, Quad failed to pay him the severance to which he was entitled. Pl. Opp. to Motion for Summary Judgment ("Pl. Opp.") at 5.

## I.      Plaintiff's Employment History

Plaintiff's employment with Quad followed more than 20 years of continuous employment by various corporate iterations of a commercial printing company.[3]

Plaintiff began working for Ronald's Federated Limited in 1985, which changed its name to BCE Publi Tech sometime between 1986 and 1987, and was acquired by Quebecor, Inc. in 1988. Def. 56.1 ¶ 5. In or around 2000, after Quebecor acquired World Color Press, Plaintiff moved to Buenos Aires, Argentina to assume the position of Senior Vice President of Latin America and Chief Administrative Officer in Latin America—or as Plaintiff put it, the "number two position in Latin America." *Id.* ¶ 6; Pl. Resp. 56.1 ¶ 6; Meyer Aff. Ex. 10.[4]

On or about May 30, 2003, while employed by Quebecor, Plaintiff received an offer to relocate to Greenwich, Connecticut to assume the title of Vice President, Business and Process Improvement. Def. 56.1 ¶¶ 7, 11. As part of that offer, Plaintiff received what he describes as an

---

[2] Plaintiff's statement clarifies that he is only pursuing a discrimination claim based on age, and not his national origin or ethnicity. Pl. Resp. 56.1 ¶¶ 2, 102–03. The Court therefore does not address Defendant's arguments regarding any national origin or ethnicity-based claim.

[3] Plaintiff's motion papers and 56.1 statement refer to these companies as Quad's "predecessors"; however, because Plaintiff's employment history spanned several acquisitions as well as a Chapter 11 bankruptcy filing by Quebecor, Defendant disputes that these companies were legal predecessors to Quad. In any event, the terminology used to refer to the companies does not affect the Court's ultimate analysis.

[4] Plaintiff signed an agreement setting forth the terms of his employment in Latin America on September 13, 2000. Meyer Aff. Ex. 10.

"Employment Agreement," although Defendant asserts that it was merely an unenforceable "Offer Letter" and not a contract. *Id.*; Pl. Resp. 56.1 ¶ 7.

The letter (hereinafter "Quebecor Letter"), drafted by Quebecor executive Mark Shapiro, provided details regarding Plaintiff's compensation and position. It also provided that in the event of Plaintiff's termination without cause, he would be provided "severance not less than what [he] would have received under similar circumstances in Quebec, Canada and company practice." Murphy Decl. Ex. F; Def. 56.1 ¶ 9. The letter asked Plaintiff to "acknowledge [his] acceptance of the position" by signing and returning the letter, but also contained this disclaimer: "While we ask you to sign this letter, please do not construe this offer as an employment contract." *Id.* Despite that language, Plaintiff testified that he nonetheless "understood [the letter] as a contract between [himself] and the company." Def. 56.1 ¶ 105 (quoting Pl. Dep. Tr. at 237).

Plaintiff continued to work for Quebecor for the next six years. In or around 2009, Quebecor filed for Chapter 11 bankruptcy in the Southern District and as part of its corporate reorganization, changed its name to World Color, Inc. *Id.* ¶ 12.[5] Without any interruption of employment, Plaintiff became an employee of World Color following the reorganization. *Id.* ¶ 13; Pl. Resp. 56.1 ¶ 13.

In July 2010, Defendant Quad acquired World Color and Plaintiff—at 54 years old—became a Quad employee. Def. 56.1 ¶ 24. Defendant's acquisition of World Color was formalized in an "Arrangement Agreement." *Id.* ¶¶ 14, 16; Murphy Decl. Ex. G. As part of Defendant's due diligence for the acquisition, World Color disclosed *inter alia* the "employment agreements or

---

[5] Although evidence of the bankruptcy is not included in the summary judgment record, the bankruptcy is a fact of public record, *see* Dkt. No. 08-CV-10152 (JMP), of which the Court may take judicial notice.

3

other obligations to World Color employees." *Id.* ¶¶ 17–18.[6]  The Quebecor Letter was not included in those disclosures. *Id.* ¶ 19; Bolt Decl. ¶¶ 3–4.[7]  Plaintiff contends, however, that he had discussions with unidentified personnel before and after the July 2010 acquisition to ensure that his personnel file was consolidated following the acquisition. *Id.* ¶ 109; Pl. Resp. 56.1 ¶ 109 (asserting that the offer letter was in Quad's possession because it was in his personnel file).

From about July 2011 to March 2012, Quad sold many of the plants World Color had previously operated in Canada to Trans-Continental, Inc. Def. 56.1 ¶ 20. As a result, Quad paid severance to certain terminated employees pursuant to a policy entitled "Termination of Employment Guidelines, Canada – Non-Unionized Employees" policy ("Canadian Severance Policy"). *Id.* ¶ 21; Murphy Decl. Ex. H. It is this policy that Plaintiff asserts should have applied to him at the time of his termination. Although Defendant asserts that the Canadian Severance Policy was applied on a case by case basis, there is no evidence in the record regarding any particular individuals to which the policy was, or was not, applied. *Id.* ¶ 22; Pl. Resp. 56.1 ¶ 22 (citing Ganfield Dep. Tr. at 62–65; Bolt Decl. ¶ 7). The parties further dispute whether the policy remained in effect at the time of Twomey's termination. Def. 56.1 ¶ 23; Pl. Resp. 56.1 ¶ 23.

When Plaintiff became employed by Defendant, he executed an acknowledgment that he had received and reviewed various Quad policies, including its Employee Guidelines. Def. 56.1 ¶ 25; Murphy Ex. I. Plaintiff asserts that neither the document he signed nor the eight documents listed in Ex. I changed his preexisting terms and conditions of employment, including the terms of his severance. Pl. Resp. 56.1 ¶ 25. Defendant contends, however, that Plaintiff's employment,

---

[6] Plaintiff disputes the materiality of this fact, Pl. Resp. 56.1 ¶¶ 17–18, but as discussed *infra*, it is relevant to both the existence of a contract between Quebecor and Plaintiff, and Quad's knowledge of any such agreement.

[7] Bolt also attests that in some other instances, World Color employees raised the existence of an offer letter with Quad and Quad either required its rescission or negotiated new terms of employment with the employee that adopted some of the previous terms of employment. Bolt Decl. ¶ 5.

4

like that of other World Color employees offered positions with Quad, was pursuant to Quad's terms and conditions, and that Plaintiff acknowledged that Quad was permitted to change the terms of his employment because it was at-will. Def. 56.1 ¶¶ 27–29. Plaintiff does not dispute that because his employment was at-will, he could be terminated at any time and that the terms and conditions of his employment were subject to change. Pl. Resp. 56.1 ¶¶ 28–29. Specifically, during the course of Plaintiff's employment by Defendant, his title, reporting structure, and salary terms changed. *Id.* ¶ 29. Plaintiff maintains, however, that these changes were consistent with his 2003 employment agreement and, moreover, could only be made prospectively. Pl. Resp. 56.1 ¶ 29.

### A. Plaintiff's Employment with Defendant Quad

During his employment with Quad, Plaintiff was the Executive Vice President of Market Development in its Retail Insert, Book, Directory and Canada Division, which later became the Books and Directories Division. Def. 56.1 ¶ 31. Initially, Plaintiff reported to Brian Freschi, the President of the Books and Directories Division; after that position was eliminated in January 2012, he reported to Davis Blais, the Executive Vice President of Sales and Client Services. *Id.* ¶ 32. Plaintiff's division, which supplied between eight to ten percent of Defendant's total revenue, operated as a sales team that "interfaced with clients and an operational footprint that consisted of manufacturing plants, which together sold, manufactured and printed books and telephone directories." *Id.* ¶¶ 33–34.

Plaintiff's primary responsibilities were negotiating contracts and estimating sale prices for products. *Id.* ¶ 36. Plaintiff played a role in making pricing proposals, leading pricing negotiations, negotiating the length or term of a contract, and "acting as a catalyst between sales, manufacturing and finance in relation to the major contracts [Quad was] entering into." *Id.* ¶ 37

5

(citing Pl. Dep. Tr. at 70–71, 75–76, 80, 83, 86, 89). Plaintiff alleged in the Amended Complaint that he was a "top level performer" for Defendant, and obtained renewal for various contracts in 2012. *Id.* ¶ 40. He elaborated at his deposition that he was a "key negotiator," and had successfully negotiated multiple contracts with his team. *Id.* ¶¶ 39, 41; Pl. Dep. Tr. at 94–95, 117–118.

On June 11, 2012, Plaintiff was informed by letter that he was to receive a $25,000 "special integration bonus" for his work. Murphy Decl. Ex. L. The bonus was to be paid on or before December 31, 2012. *Id.* As Plaintiff was no longer employed by that date, he did not receive it. Pl. Resp. 56.1 ¶ 42.

Despite the issuance of that bonus letter, the parties do not dispute that by 2012, the Books and Directories Division where Plaintiff worked was suffering financially. Def. 56.1 ¶ 45. Plaintiff testified at his deposition that he believed the poor performance was a result of multiple factors including a change of the reporting structure within the company, poor economic performance in specific plants, "significant costs resulting from the decision to combine certain plants," and a "failure to manufacture in accordance with specifications." *Id.* ¶ 46 (quoting Pl. Dep. Tr. at 139–40); *see also* Pl. Resp. 56.1¶ 47 (also citing "other management errors").

On or about October 2, 2012, David Blais promoted Jeff Duening from Vice President of Sales for the Publishing Solutions Division to Vice President and General Manager of the Books and Directories Division. Def. 56.1 ¶ 48; Pl. Resp. 56.1 ¶ 48. Duening was 47 at the time. Def. 56.1 ¶ 49. After the promotion, Plaintiff reported directly to Duening. *Id.* ¶ 52.

Duening was charged with taking "whatever strategic steps he thought necessary" to restore the Books and Directories Division to profitability. *Id.* ¶ 50. He testified that he believed the division's poor performance was a result of a "combination of mismanagement, inefficient operations, most likely some poor decision-making, bad pricing, macroeconomic [and] industry

changes." *Id.* ¶ 55 (quoting Deuning Dep. Tr. at 68). Duening decided to undertake a reorganization of the division to address these problems. *Id.* ¶ 57.[8] The parties do not dispute that in the course of such reorganization effort, Duening looked for managers who were the "key drivers of the business and who [were] responsible for the key drivers of the business, namely operations and pricing." *Id.* ¶ 58 (quoting Duening Dep Tr. at 77). They do dispute, however, whether Duening considered the amount of consideration paid to any potential targets for termination; Defendant claims he did not, but Plaintiff cites to Duening's deposition testimony in which he conceded that salaries "sometimes" factored into the cost reductions. Def. 56.1 ¶ 59; Pl. Resp. 56.1 ¶ 59 (citing Duening Dep. Tr. at 164).

On or about October 13, 2012, Duening emailed Tom Frankowski, Quad's Exective Vice President of Manufacturing and Operations, Greg Bolt, executive Vice President of Human Resources, and David Blais with his reorganization proposal, which included terminating Plaintiff as well as two other employees, Gary Durand and John Kelly. Def. 56.1 ¶ 60; Murphy Decl. Ex. O. At his deposition, Duening stated that the restructuring decisions—including the termination of Plaintiff, Durand, and Kelly—were his decisions alone and did not require the approval of anyone else at the company. *Id.* ¶ 61.

## B. Plaintiff's Termination

On November 9, 2012, Duening met with Plaintiff at Quad's New York City office and informed him that he was terminated. Def. 56.1 ¶ 84. Plaintiff does not recall any particular statements made during the meeting. *Id.* ¶ 85. Duening testified that he recalled that Plaintiff expressed surprise, but that he communicated that he "understood that the business was in distress

---

[8] Plaintiff disputes that Duening's beliefs are relevant, but insofar as they go to the basis for Plaintiff's termination, the Court disagrees. Pl. Resp. 56.1 ¶¶ 56–57.

and that the industry was in distress and decline." Duening Dep. Tr. at 142. Immediately after the meeting, Plaintiff met with Dana Worland from Human Resources, who presented him with a severance package. Def. 56.1 ¶¶ 87–88.

Plaintiff, then 56, was replaced by Dave Grunwaldt, who had worked at Quad for approximately 20 years in pricing and development. Def. 56.1 ¶ 64. Duening testified that he had good experience with Grunwaldt and he thought he would "do a better job at pricing contracts" than Plaintiff; Grunwaldt was also located in Sussex, Wisconsin where Duening worked. Def. 56.1 ¶¶ 65–66 (quoting Duening Dep. Tr. at 83). Plaintiff disputes Duening's assertion that Grunwaldt was a better candidate, citing that he had fewer years of experience than Plaintiff and lacked the same relationships with customers in the book publishing industry. Pl. Resp. 56.1 ¶ 66. Although Defendant disputes that Plaintiff had any personal knowledge regarding Grunwaldt's relative qualifications, Plaintiff asserts that Grunwaldt necessarily had less experience because he was younger, and that "major book publishers" he knew claimed not to know Grunwaldt. Def. 56.1 ¶¶ 67–68; Pl. Resp. 56.1 ¶ 67.[9]

As to the basis for his termination, Plaintiff conceded at his deposition that Duening's opinion of his performance at Quad may have been different than Plaintiff's own opinion. Def. 56.1 ¶ 69 (citing Pl. Dep. Tr. at 166). Plaintiff also acknowledged that he did not know who made or approved the decision to terminate him, when the decision was made, or who decided to promote Grunwaldt, but he testified that Duening and Joel Quadrucci would have been involved in the decision. Id. ¶ 70; Pl. Resp. 56.1 ¶ 70; Pl. Dep. Tr. at 156–57. The parties dispute whether Duening knew Plaintiff and Grunwaldt's respective ages at the time of Plaintiff's termination. Duening

---

[9] The parties' 56.1 statements do not provide Grunwaldt's exact age, although Defendant states in its summary judgment brief that he was 49 at the time he replaced Plaintiff. Def. Mem. in Support of Motion for Summary Judgment ("Def. Mem.") at 7.

testified that he did not, but Plaintiff asserts that Duening had worked with them both and thus had the opportunity to "form an impression of their ages." Def. 56.1 ¶ 71; Pl. Resp. 56.1 ¶ 71.

Following his termination, on November 16, 2012, Plaintiff emailed Dana Worland in Human Resources the 2003 Quebecor Letter, asserting that Quad's severance offer to him was insufficient. Def. 56.1 ¶ 92; Murphy Decl. Ex. S. Defendant claims that this was the first time Plaintiff disclosed the letter or that anyone at Quad learned of the document's existence. *Id.* (citing Bolt Decl. ¶¶ 3–6). Plaintiff asserts, however, that he was under no obligation to disclose the document because it was already in Quad's possession in his personnel file. Pl. Resp. 56.1 ¶ 92.

## C. Other Purportedly Age-Based Terminations

Around the same time in 2012, Gary Durand, John Kelly, Gary Armstrong, and Art Tonucci were terminated by Quad as well. Def. 56.1 ¶¶ 72, 76, 79, 82. Plaintiff claims that each of these terminations was also age-based. Although Duening testified at his deposition that he was not aware of the respective ages of these employees or their replacements at the time of the terminations, Plaintiff claims he had the opportunity to observe them and "form an impression of their ages." *Id.* ¶¶ 75, 78, 81; Pl. 56.1 ¶ 75, 78, 81.[10]

Durand, the Executive Director of Operations for Books and Directories, was replaced by Susan Reeve. Murphy Decl. Ex. P. Plaintiff asserts that Reeve was 47 at the time, as compared to Durand who was 61. Pl. Resp. 56.1 ¶ 73. Duening testified that Durand's performance "was such that the business was deteriorating rapidly under his watch operationally" and that because Reeve was "running a good plant," he believed she would do a better job in the position. Def. 56.1 ¶ 74 (quoting Duening Dep. Tr. at 82).

---

[10] The only evidence in the record of the ages of the terminated employees and their replacements is Plaintiff's deposition testimony.

9

John Kelly, the Plant Director in Fairfield, Pennsylvania, was terminated, by Duening's account, because his plant was "not performing." Def. 56.1 ¶ 76 (citing Duening Dep. Tr. at 193). He was replaced by Jeff Newhouse, who Duening described as "transparent," "collaborative, people-oriented, supportive of his team, not heavy-handed in his management style, [and] detail oriented." *Id.* ¶ 77 (quoting Duening Dep. Tr. at 195). Plaintiff asserts that Kelly was in his fifties and Newhouse was in his mid-forties at the time of the replacement. Pl. Resp. 56.1 ¶ 77.

Gary Armstrong, purportedly in his fifties at the time, was in charge of the Books and Directories Division's "digital operations." Def. 56.1 ¶ 79; Pl. Resp. 56.1 ¶ 79. Duening claimed those operations were "struggling in a big way"—the costs of operations, he said, were not supported by the pricing structures in place. Def. 56.1 ¶ 79 (quoting Duening Dep. Tr. at 190–91). Armstrong was not replaced. *Id.* ¶ 80.

Art Tonucci, a Sales Representative, purportedly in his fifties as well, was also terminated around the same time and not replaced. *Id.* ¶ 82; Pl. Resp. 56.1 ¶ 82. Duening asserted that Tonucci's termination was not part of his reorganization efforts, but was likewise motivated by declining business; the decision to terminate Tonucci was made by Gary Brusseau, the Vice President of Book Sales. Def. 56.1 ¶ 82; Duening Dep. Tr. at 134, 145, 149–50. Plaintiff asserts that Tonucci's termination was part of the same, deliberate "removal of older workers." Pl. Resp. 56.1 ¶ 82.

Plaintiff also contends that, at unspecified times, other individuals over age 50 were terminated by Quad, including Dean Weiner, Brian Freschi, and Bill Louis. Def. 56.1 ¶ 95. Plaintiff testified that he believed that Weimer was terminated because he and Quad executive Frankowski disagreed on "approaches" and Weimer's approach was "considered to be older and outdated." *Id.* (citing Pl. Dep. Tr. at 198). He based this belief on conversations he had with

unidentified "multiple people." *Id.* Plaintiff also believed that Freschi was terminated because he "was not considered to be part of the Quad group and did not fit into the organization." *Id.* (citing Pl. Dep. Tr. at 199).

Plaintiff further believed that Defendant implemented "deliberate and concerted plans" to terminate employees in plants where the average age is older than the average age" of Quad employees. *Id.* Def. 56.1 ¶ 96 (quoting Pl. Dep. Tr. at 192).[11] Plaintiff did not profess to have any information regarding the actual ages of terminated employees at those plants, but testified that he became familiar with the "average age" of the employees of closed plants "[f]rom physically walking through the plant, from seeing information about the age of the workforce and about the pension issues that may have existed with regard to the workforces." *Id.* ¶ 98 (quoting Pl. Dep. Tr. at 196).

Defendant asserts that beyond the November 2012 terminations discussed above, Plaintiff has no information regarding any termination or hiring decisions that occurred after July 2012, and that the Court rightly denied his attempts to obtain such information through discovery on four separate occasions. Def. 56.1 ¶¶ 100 (citing Dkt. 32, 36, 42, 54). Although Plaintiff contends that there is "ample evidence in the record that [he] had knowledge concerning hiring and termination decisions" after July 2012, he does not point to any such specific evidence. *See* Pl. Resp. 56.1 ¶ 100–01.

## II.   Procedural History

Plaintiff commenced this action by filing a complaint in New York state court on January 23, 2013, asserting a claim for breach of contract and an employment discrimination claim pursuant to the New York City Human Rights Law ("NYCHRL") and the New York State Human

---

[11] Plaintiff also asserted that Quad closed plants because the plants were "unionized." *Id.* ¶ 97 (quoting Pl. Dep. Tr. at 193–94).

11

Rights Law ("NYSHRL"). On February 19, 2013, Defendant removed the action to federal court. Dkt. 1. Plaintiff filed an amended complaint on March 5, 2013. Dkt. 7. In substance, Plaintiff's amended complaint alleged that he and other management level employees of similar age and experience were terminated and replaced by significantly younger and less experienced attorneys. Am. Compl. ¶¶ 2–3.

After discovery, Plaintiff moved for partial summary judgment on his breach of contract claim, Dkt. 72, and Defendant moved for summary judgment on all claims, Dkt. 74.

## LEGAL STANDARD

Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). In making such determination, the Court must "must resolve all ambiguities and draw all reasonable inferences against the moving party." *Id.* (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Apostol v. City of New York*, 607 F. App'x 105, 106 (2d Cir. 2015) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted)).

## DISCUSSION

### I.     Age Discrimination Claims

Defendant moves for summary judgment on Plaintiff's age discrimination claims, arguing that by relying only on his unsubstantiated speculation, Plaintiff has failed to establish an age discrimination claim under either the NYSHRL or the NYCHRL. Def. Mem. at 4. The Court agrees.

Plaintiff's age discrimination claims are analyzed under the familiar burden-shifting framework introduced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). In a case relying on circumstantial evidence, the plaintiff "bears the initial burden of establishing a prima facie case by showing that the claimant was a member of the protected class, that the claimant was qualified for the position, and that the claimant experienced an adverse employment action under circumstances giving rise to an inference of discrimination." *DeKenipp v. State of New York*, 97 A.D.3d 1068, 1069 (N.Y. App. Div. 3d Dep't. 2012) (citing *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010)). Once the plaintiff meets this minimal burden, "the employer must set forth legitimate and nondiscriminatory reasons for the alleged improper employment action." *Id.* If the employer does so, the plaintiff must demonstrate "that the reasons proffered by the employer were mere pretext" in order to prevail. *Id.* In the federal Age Discrimination in Employment Act ("ADEA") context, the plaintiff "must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action" and not just a contributing or motivating factor, *Gorzynski*, 596 F.3d at 106; however, the New York courts have not yet decided whether this more stringent causation standard applies to a claim under state law, *DeKenipp*, 97 A.D.3d at 1070.

Furthermore, although courts often coextensively analyze employment discrimination claims under federal, state, and city law, since the NYCHRL was amended in 2005, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims." *Velazco v. Columbus Citizens Found.*, 778 F.3d 409, 411 (2d Cir. 2015) (quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)). Thus, "even if the challenged conduct is not actionable under [state law], federal courts must consider separately whether it is actionable under the broader New York City standards." *Mihalik*, 715 F.3d at 109. Pursuant to

13

this less stringent standard, Plaintiff may defeat summary judgment on his NYCHRL claim by demonstrating that age-based discrimination was a "motivating factor"—even if not the "but for cause"—of the decision to terminate him. *Melman v. Montefiore Med. Ctr.*, 98 A.D.3d 107, 127 (N.Y. App. Div. 1st Dep't 2012). Nevertheless, Plaintiff has failed to set forth sufficient evidence to support a claim under either New York State or City law.

## A. Prima Facie Case

As to Plaintiff's prima facie case for discrimination, Defendant assumes for the purposes of this motion that Plaintiff has adequately established the first three prongs: that he (1) was a member of a protected age group, (2) was qualified to perform the job in question, and (3) was discharged. Def. Mem. at 5. Defendant asserts, however, that Plaintiff has not sufficiently established the fourth prong: that he was discharged under circumstances giving rise to an inference of discrimination. *Id.*

Plaintiff argues that he has satisfied this prong with evidence that he was replaced by a "significantly younger worker" and that he was terminated on the same day as four other workers over the age of 50. Pl. Opp. at 22. Two of those workers were purportedly replaced with younger workers and the other two workers were not replaced. *Id.* at 23 (citing Twomey Dep. Tr. at 188, 190, 194; Duening Dep. Tr. at 78, 192). As Defendant points out, however, there was only a seven year age difference between Plaintiff and his replacement, which has been found to be insufficient to establish an inference of discrimination. Def. Mem. at 7; *see Catanzaro v. City of New York*, 10-CV-1825 (JSR), 2011 WL 335648, at *5 (S.D.N.Y. Jan. 25, 2011) (finding seven year age difference to be insufficient without additional indicia of age-based discrimination). While this evidence is far from overwhelming, because Plaintiff also relies on other purportedly age-based

terminations occurring at the same time, and because his burden at this stage of the analysis is *de minimus*, the Court assumes *arguendo* that the prima facie case is satisfied.

### B. Non-Discriminatory Basis for Plaintiff's Termination

In response to Plaintiff's prima facie case, Defendant must set forth a legitimate, non-discriminatory basis for Plaintiff's termination and it has done so. Specifically, Defendant argues that Plaintiff was terminated as part of a "restructuring of a discrete business division that was underperforming." Def. Mem. at 10. It is well-established in the Second Circuit that an economically-motivated reorganization generally does not support an age discrimination claim so long as the reorganization decision was "made on a rational basis." *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 657 (2d Cir. 2009) (citing *Parcinski v. Outlet Co.*, 673 F.2d 34, 37 (2d Cir. 1982)). To establish such rational basis, Defendant points to the undisputed poor performance of Plaintiff's division, and, through Duening's testimony, offers Quad's rationale for replacing certain management employees in that division who were responsible for operations and pricing. Def. 56.1 ¶ 58 (quoting Duening Dep. Tr. at 77).

According to Duening, when he became the head of the Books and Directories Division in October 2012, he determined that the division was "unhealthy and not performing." Def. 56.1 ¶¶ 48, 54 (quoting Duening Dep. Tr. at 68, 80). He testified that he believed this was the result of both macroeconomic and industry problems, as well as mismanagement, inefficient operations, poor decision-making, and bad pricing. Duening Dep. Tr. at 84–85, 104–05. To correct these issues, Duening decided to make changes to "leadership positions" and looked to persons in management roles—including Plaintiff—to effect the reorganization. Def. 56.1 ¶¶ 57–58. Plaintiff does not dispute that the division was performing poorly or that Duening undertook a re-organization as result; indeed, in an email to Duening in October 2012, he noted that the group

needed to "significantly improve our results." Murphy Ex. N.; *see also* Pl. Resp. 56.1 ¶¶ 54–56. The reorganization effort is also documented in emails between Duening and other Quad executives in October 2013. *See* Murphy Decl. Ex. O. Duening's testimony further provided specific factual bases for terminating Plaintiff and the four other employees terminated around the same time—explaining why each of those employees were selected for termination and their roles in the poor performance of their respective divisions. *See* Def. 56.1 ¶ 65 (professing his belief that Grunwaldt would "do a better job at pricing contracts" than Plaintiff because of his contrasting "disciplined approach"), ¶ 74 (explaining that Durand's "performance was such that the business was deteriorating rapidly under his watch operationally"), ¶ 76 (stating that Kelly was terminated "[b]ecause his plant was not performing"); ¶ 79 (explaining that Armstrong's digital operations division was "struggling in a big way"); ¶ 82 (distinguishing Tonucci's termination as unrelated to the corporate restructuring and corresponding terminations).

Defendant has thus provided a rational basis for its corporate reorganization and Plaintiff's consequent termination, shifting the burden to Plaintiff to demonstrate that the proffered explanation is pretextual. He has been unable to do so.

### C. Plaintiff's Rebuttal of Defendant's Proffered Explanation

Plaintiff asserts that his termination was part of a "pattern" of terminating the "oldest" employees who "normally were more highly compensated than other employees." Pl. Dep. Tr. at 205, 208. He also asserts that certain manufacturing plans were "systematically" closed based on the average age of the employees. *Id.* at 193–94. For these propositions, Plaintiff relies entirely on his own observations and deposition testimony, which are not corroborated by any statements of other Quad employees—including those he claims were also terminated because of their ages— or other extrinsic evidence. Significantly, there is no statistical or other evidence in the record

regarding the average age of employees at the closed plants, or the salaries earned by terminated employees or their replacements. As the Second Circuit held in another age discrimination case, where the plaintiff relies only on his own "self-serving testimony," "[s]uch evidence is insufficient to defeat summary judgment." *Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656 (2d Cir. 2009) (allowing "a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial" in all employment discrimination actions) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

Furthermore, to the extent Plaintiff separately relies on the seven-year age difference between himself and his replacement, this is insufficient in itself to show that Defendant's explanation was pretextual. *See, e.g.*, *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 510–11 (S.D.N.Y. 2010) (rejecting Plaintiff's tendered proof of 12 year age difference to show pretext) (citing *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 317 (2d Cir. 1999)); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 715, 719 (2d Cir. 1994); *Brooks v. Leake & Watts Org., Inc.*, No. 02–CV–9865 (GEL), 2005 WL 1875772, at *8 (S.D.N.Y. Aug. 2, 2005)). This is particularly true in light of Duening's testimony that he did not know the ages of Plaintiff or the other employees terminated during the reorganization. *See* Duening Dep. Tr. at 78, 82, 147, 194–95; Duening Decl. ¶ 2. Even where—unlike here—there is a substantial age difference, it is Defendant's knowledge of such discrepancy that is relevant to the inference of discriminatory intent. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 78 (2d Cir. 2005). Plaintiff disputes Duening's disavowal of any knowledge of his and Grunwaldt's respective ages, but he has failed to point to any evidence—direct or circumstantial—in the record that would refute Duening's assertion. *See*

17

*id.* at 83 (affirming summary judgment for defendant where plaintiff failed to demonstrate defendant's knowledge of plaintiff's age relative to that of her replacement).[12]

Plaintiff has therefore failed to establish that Defendant's proffered explanation was pretextual. This is the case as to Plaintiff's state law claim under the NYSHRL regardless of whether the "but-for" causation standard adopted under the ADEA applies. *See* discussion *supra* p. 13. Because the record is devoid of any evidence to support Plaintiff's assertions regarding the basis for his termination, even if the Court employed "the less stringent" causation standard and "required only that age was a 'motivating factor,'" it "would still conclude that [Plaintiff] had not proffered sufficient evidence of pretext." *Mikinberg v. Bemis Co.*, 555 F. App'x 34, 35 (2d Cir. 2014).

Plaintiff's NYCHRL claim also fails on this basis. Because of the statute's broader scope, the Court must separately examine Plaintiff's NYCHRL claim to determine "whether the evidence was insufficient to support any causal link between age bias and plaintiff's firing." *Velazco*, 778 F.3d at 411 (citing *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 40 (N.Y. App. Div. 1st Dep't 2011)); *see also Melman*, 98 A.D.3d at 127. But even "[a]pplying this separate analysis with a focus on the 'uniquely broad and remedial' aspects of the NYCHRL," Plaintiff must offer some proof beyond his own assertions that age was a factor considered by Quad and he has failed to do so here. *See Snowden v. Trustees of Columbia Univ.*, No. 12-CV-3095 (GBD), 2014 WL 1274514, at *9 (S.D.N.Y. Mar. 26, 2014), *aff'd*, __F. App'x__, 2015 WL 1727068 (2d Cir. Apr. 16, 2015) (quoting *Williams v. NYC Housing Auth.*, 61 A.D.3d 62, 66–68 (N.Y. App. Div. 1st Dep't 2009)).

---

[12] For this reason, Plaintiff similarly cannot rely on the respective age differences of the other terminated employees and their replacements. Although he asserts that Duening had opportunities to "observe" those employees and form an impression of their ages, Pl. Resp. 56.1 ¶¶ 71, 75, 78, 81, there is no evidence in the record that would suggest that Duening was aware of their respective ages when he made the termination decisions. Indeed, other than Plaintiff's own testimony, there is no evidence in the record whatsoever regarding those employees' respective ages. Because Plaintiff has failed to substantiate his speculation in any way, he fails to create an issue of material fact.

Accordingly, Plaintiff's age discrimination claims under both the NYSHRL and the NYCHRL fail as a matter of law.

## II.    Breach of Contract Claim

Both Plaintiff and Defendant move for summary judgment on Plaintiff's breach of contract claim. Plaintiff argues that by signing the Quebecor Letter, he entered into an "at-will employment agreement which provided for the payment of severance to him in the event of his involuntary termination," Pl. Mem. in Support of Partial Summary Judgment ("Pl. PSJ Mem.") at 1, which he was never paid. Based on that contract, he maintains, he was entitled to the severance provided under Quebecor's Canadian Severance Policy when he was terminated by Quad in 2012. *Id.* at 1– 2. Defendant opposes Plaintiff's motion and moves for summary judgment on its own behalf, arguing that the Quebecor Letter is not an enforceable contract, citing to the express disclaimer in the letter. Def. Mem. at 15; Def. Mem. in Opp. to Pl. Partial Summary Judgment Motion ("Def. PSJ Opp.") at 2. Furthermore, Defendant argues that even if the Court were to conclude that the offer letter constituted a contract, the severance provision cannot be enforced against Quad, which was not the entity that entered the purported agreement. Def. PSJ Opp. at 5–7.

To establish a breach of contract claim under New York law, Plaintiff must demonstrate "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011) (citations omitted); *see also El-Nahal v. FA Mgmt., Inc.*, 126 A.D.3d 667, 668 (N.Y. App. Div. 2d Dep't 2015). Although the parties dispute each element of the claim, the Court's disposition of the claim ultimately turns on whether there was an enforceable contract.

## A. Existence of a Contract

To establish that the parties formed a contract, Plaintiff must show that there was "an offer, acceptance, consideration, mutual assent and intent to be bound." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 507 (2d Cir. 2009) (*abrogated on other grounds*) (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004)). Plaintiff's claim here is premised solely on the Quebecor Letter; he does not assert the existence of any other contract with Quad—in fact or implied— entitling him to relief.

Plaintiff argues that the Quebecor Letter constituted a valid employment agreement because (1) Twomey accepted the terms of the letter by signing it, (2) Quebecor acknowledged the agreement in an employment verification letter it sent to Citibank, and (3) Twomey moved to the United States in June 2003 to begin work in July 2003. Pl. PSJ Mem. at 8. Although the Quebecor Letter specified certain aspects of Plaintiff's employment with Quebecor, such as his salary, position, and information regarding his severance, the Court agrees with Quad that it does not constitute an enforceable contract.

As discussed above, the Quebecor Letter was provided to Plaintiff on May 30, 2003 by Quebecor World in connection with its offer of the position of Vice President of Business and Process Improvement in Greenwich, Connecticut. In a series of bullet points, the two page letter outlined Plaintiff's proposed salary, living stipend, reimbursements, and other financial compensation and benefits. It also addressed Plaintiff's severance in the event he was terminated without cause, providing that Plaintiff "would be provided severance not less than what [he] would have received under similar circumstances in Quebec, Canada and company practice." Meyer Aff. Ex. 3. At the conclusion of the letter, Plaintiff was directed to sign and return it to the attention of Mark Shapiro, the Executive Vice President of Human Resources. *Id.* Directly following that

sentence, the letter further provided: "While we ask you to sign this letter, please do not construe this offer as an employment contract." *Id.*

On the basis of this disclaimer, Defendant argues that the Quebecor Letter cannot be construed as a contract and that summary judgment in its favor is appropriate. Plaintiff does not dispute that the disclaimer was in the Quebecor Letter, or that he signed it; nor does he claim that he sought to have the language removed from the document. *See* Pl. Dep. Tr. at 241–42. Rather, he asserts that he was "assured" by Quebecor's Shapiro that the disclaimer applied to a "specific term of employment" and not the document as a whole. *Id.* Plaintiff does not specify, however, which term he believed the disclaimer related to; nor is there any evidence in the record that any World Color or Quad employee knew about the letter and the purported obligations set forth therein.

In cases in which the defendant relies on a disclaimer to defeat a contract claim, courts look to the language of the disclaimer as well as the expressed intent of the parties in order to determine whether a contract was entered. *See, e.g., Kendall v. Fisse,* 2004 WL 1196811, at *7 (E.D.N.Y. May 25, 2004), *aff'd,* 149 F. App'x 19 (2d Cir. 2005) (dismissing breach of contract claim based on an offer letter that did not purport to employ plaintiff for a definite duration); *Baron v. Port Auth. of N.Y. & N.J.,* 271 F.3d 81, 87 (2d Cir. 2001) (affirming summary judgment on New York contract claim for defendant employer based on unambiguous disclaimers in employee handbook). Here, Plaintiff's interpretation of the letter as a contract is plainly contravened by the disclaimer, which expressly disavows any intent on the part of Quebecor for Plaintiff to rely on the offer letter as an employment contract. *See Barker v. Time Warner Cable, Inc.,* 897 N.Y.S.2d 668, at *4 (table decision) (N.Y. Sup. Ct. 2009) (rejecting claim that offer letter constituted agreement where the

21

offer of employment "plainly stated" that the letter was not "a contract of employment or a guarantee of employment or compensation"), *aff'd*, 83 A.D.3d 750 (App. Div. 2d Dep't 2011).

This contrasts with cases in which the parties both asserted the enforceability of most if not all of the contract, such as *Howard v. Greenbriar Equity Grp., LLC*, cited by Plaintiff. 872 N.Y.S.2d 691, at *7 (N.Y. Sup. Ct. 2008) (table opinion). There, the Court concluded that the offer letter constituted an enforceable contract because both parties demonstrated an intent to be bound by the letter and relied on its enforceability. In the offer letter in *Howard*, the disclaimer immediately followed language in the same sentence providing that the employment would be "on at will basis." The Court thus read the disclaimer as only amplifying the preceding clause, not the entire document. *Id.* Here, however, there is no evidence that Quebecor—or World Color, or Quad—ever viewed the offer letter as a binding contract.[13] Quad, unlike the defendant employer in *Howard*, does not seek to enforce any provision of the letter in this action; instead, Quad relies solely on the terms and conditions of employment communicated to Plaintiff when he was offered a position after the World Color acquisition. *See* Def. 56.1 ¶ 25; Murphy Ex. I.

Furthermore, the disclaimer in the Quebecor Letter contains no limiting language that would indicate that it applied only to certain parts of the offer. For instance, it does not invoke or refer to only one clause or section; rather, it refers to the "letter" and the "offer" as a whole. By contrast, in *Arakelian v. Omnicare*, also cited by Plaintiff, the offer letter did not contain such a general disclaimer. 735 F. Supp. 2d 22 (S.D.N.Y. 2010). Instead, it read that "[w]hile this letter is our commitment to employ you in the previously mentioned position, please understand that it does not constitute a contract or promise of employment *for any specific length of time*." *Id.* at 32.

---

[13] Indeed, Quad contends that it had no knowledge of the Quebecor Letter until November 16, 2012—seven days after Plaintiff's termination. Def. 56.1 ¶ 92.

Similarly, in *Broyles v. J.P. Morgan Chase & Co.*, the offer letter itself contained no disclaimer. No. 08-CV-3391 (WHP), 2010 WL 815123, at *3 (S.D.N.Y. Mar. 8, 2010). In fact, that letter provided that it "contain[ed] the entire understanding of the parties with respect to the terms and conditions of the offer of employment and supersede[d] any prior verbal or written communication." *Id.* at *3–4 (rejecting argument that incorporation of at-will policy rendered the letter unenforceable). The Quebecor Letter contains no such contentions.

Plaintiff's unsupported assertions regarding the disclaimer's scope do not negate its effect or render it ambiguous. *See Baron*, 271 F.3d at 86. *See also Media Tenor Int'l AG v. Medco Health Sol.'s, Inc.*, No. 13-CV-7223 (DLC), 2014 WL 2933215, at *5 (S.D.N.Y. June 27, 2014) ("Ambiguity does not arise merely by virtue of the fact that the parties volunteer different definitions.") (citing *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)). Furthermore, notwithstanding the disclaimer, the affirmative evidence on which Plaintiff relies also falls short of creating a genuine dispute regarding the existence of a contract. For instance, although he cites to Quebecor's purported acknowledgment of the contract in an employment verification letter it sent to Citibank, that letter does not actually reference an employment agreement; it merely verifies Plaintiff's position, location, and salary information. Meyer Aff. Ex. 9. And while Plaintiff contends that he confirmed with unidentified personnel that his personnel file was consolidated during World Color's acquisition by Quad, Pl. Resp. 56.1 ¶ 109, that fact is not probative of whether the Quebecor Letter ever constituted a binding agreement.

Finally, even if the Court were to find that the Quebecor Letter constituted a contract in 2003, there is no evidence in the record from which to conclude that the terms set forth in the letter—including the information regarding severance—remained in effect when Plaintiff accepted a new position with Quad. *See* Def. Mem. at 20. After Plaintiff signed the Quebecor Letter in

2003, Quebecor filed for Chapter 11 Bankruptcy in 2009 and re-emerged as World Color. Def. 56.1 ¶ 12. Plaintiff then became a World Color employee. *Id.* ¶ 13. Neither party cites any evidence regarding Plaintiff's terms of employment while in that position. Defendant does assert, however, that when World Color disclosed "employment agreements or other obligations to World Color employees" as part of Quad's pre-acquisition due diligence, the Quebecor letter was not included those disclosures. Def. 56.1 ¶¶ 17–19. In addition, as there is no dispute that Plaintiff was an at-will employee, Pl. Resp. 56.1 ¶ 28, Quad was free to change the terms and conditions of his employment, *id.* ¶ 29. Indeed, after Quad acquired World Color, certain terms of his employment—such as his title and salary—were changed. Def. 56.1 ¶ 29.[14]

For these reasons, the Court concludes that no reasonable juror could find from the record before the Court that the Quebecor Letter constitutes an enforceable contract against Quad.

**B. Canadian Severance Policy**

Because Plaintiff relies only on the Quebecor Letter for his contract claim, and because the Court concludes that the letter does not constitute a valid contract, the Court need not address whether in accordance with the letter, Plaintiff was entitled to severance under the Canadian Severance Policy. Plaintiff has failed to set forth any evidence establishing that he is entitled to summary judgment on his contract claim, or to defeat Defendant's motion for the same.

---

[14] It is not clear, however, whether Plaintiff was specifically advised in any way—including through the policies he was given to review when he became employed by Quad—of Quad's severance policy. Although Defendant asserts that the policies he reviewed and acknowledged "necessarily included Quad's Separation Assistance Policy," Def. Mem. at 21, the acknowledgment Plaintiff executed does not specifically list this policy, *see* Murphy Decl. Ex. I. Nevertheless, the issue before the Court is not whether Defendant has established beyond dispute that Plaintiff agreed to Quad's severance policy; rather, it is whether there is a genuine dispute that the Quebecor Letter constitutes an enforceable contract against Quad entitling him to severance in accord with the Canadian Severance Policy.

## CONCLUSION

For the foregoing reasons, (1) Plaintiff's motion for partial summary judgment on his contact claim is denied, and (2) Defendant's motion for summary judgment is granted in its entirety.

The Clerk of the Court is respectfully directed to terminate items 72 and 74 on the docket and to close the case.

SO ORDERED.

Dated: September 28, 2015
   New York, New York

              Ronnie Abrams
              United States District Judge